In re Laura Ann CULLEN, Debtor.

**FIRST COMMUNITY CREDIT UNION, Plaintiff,**

v.

Laura Ann CULLEN, Defendant.

**CHASE MANHATTAN BANK, Plaintiff,**

v.

Laura Ann CULLEN, Defendant.

Bankruptcy No. 85–01159(2).

Adv. Nos. 85–0224(2), 85–0225(2).

United States Bankruptcy Court,
E.D. Missouri, E.D.

May 5, 1986.

Alan D. Teitelbaum, Bridgeton, Mo., for debtor/defendant.

Donald B. Kramer, St. Louis, Mo., for plaintiff.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### INTRODUCTION

On June 21, 1985, the Court ordered relief on the Debtor's voluntary Chapter 7 petition. On August 30, 1985, the Chase Manhattan Bank, N.A., ("Chase") and First Community Credit Union ("First Community") timely filed separate complaints to determine the dischargeability of debts. Each Plaintiff also prays for a money judgment against the Debtor for whatever amount is determined to be nondischargeable. On October 9, 1985, Debtor filed her Answer to Chase's Complaint in which she denied that Chase was entitled to relief. On November 14, 1985, Debtor filed a similar Answer to First Community's Complaint. Since the two complaints involve common issues of law and fact, the separate adversary proceedings were consolidated for purposes of trial and heard together on January 23, 1986. At the conclusion of the trial, the Court reserved ruling pending the submission of briefs. Upon the evidence adduced, the briefs submitted by counsel, and all matters of record, the Court will this date enter separate orders finding the respective debts to be nondischargeable and granting judgments for Chase and First Community against the Debtor.

### FINDINGS OF FACT

a. *The Chase Complaint*

On October 1, 1984, slightly less than nine months before her bankruptcy petition

herein, Debtor applied to Chase for a Visa card. Although at the time of her application Debtor was employed at an annual salary of approximately $18,000.00, her liabilities even then exceeded her assets by at least $30,000.00. Nonetheless, her credit application was accepted and a credit line of $1,000 extended.

On November 7, 1984, Debtor received a cash advance of $1,000.00. On November 17, 1984, Chase notified Debtor that she had exceeded her credit line by $168.46 and directed her to "refrain from further use of your account until the balance of $1,168.46 has been reduced below the assigned credit line." On the reverse side of this notification was an application to increase her credit line. On December 3, 1984, Debtor applied to increase her credit line by completing the form and returning it to Chase. It is interesting to note that although representatives of Chase testified that as the Debtor continued to use the credit card, they mailed her numerous notices to stop using the account. The Debtor admitted she received the notice which she had returned seeking additional credit, but denied receiving any other notices. The application to increase credit also indicated an annual salary of $28,500 when she knew her income was only $18,000.

Notwithstanding the absence of additional credit, and in the face of Chase's notification directing Debtor not to use her account until the balance dropped below $1,000.00, Debtor continued to charge for approximately six months until her debt reached $16,235.23, of which $805.29 was finance charges. During this period the Debtor paid Chase $20.00 on November 23, 1984 and $10.00 on January 3, 1985; and First Community $972.00.

In incurring this debt, Debtor made over 500 charges of $50.00 or less and only five charges of more than $50.00. Even those in excess of $50.00, however, were only slightly more than that amount. This pattern of debt incurrence is significant because merchants seldom, if ever, verify that charges of less than $50.00 are authorized by the credit card issuer. While

Debtor denied that she deliberately kept her charges under $50.00 to avoid detection by the credit card issuer and further maintained that her credit worthiness was verified when she presented her credit card for payment, the Court does not find her testimony in this regard credible.

### b. *The First Community Complaint*

Debtor opened her Visa account with First Community in August, 1984. Again, notwithstanding the fact that Debtor's liabilities exceeded her assets by at least $30,000.00, and that her annual income was only approximately $18,000.00, First Community extended Debtor a $2,000.00 line of credit. As in the case of her Chase account, Debtor quickly exhausted her credit line through cash advances. On August 17, 1984, she made three cash advances totaling $1,930.00. By the end of August, 1984, (the first month) Debtor had exceeded her credit line. In the ensuing months Debtor made more than 150 charges, again almost always in amounts of less than $50.00, until her debt reached $7,351.65, of which $317.85 was finance charges. On June 12, 1985, Visa notified Debtor that her account was cancelled, and no charges were made by Debtor after that date.

### c. *Other Credit Cards*

Although only Chase and First Community filed adversary complaints to deny discharge of their debts, the Debtor's Schedule A–3 reveals extensive use of other credit cards. The following is a partial list:

| | |
|---|---|
| American Express | $ 3,136.80 |
| Bank of America (Visa) Pasadena, CA | 1,958.78 |
| Bank of America Premium Card (Visa) Pasadena, CA | 5,442.37 |
| Bank of America (Mastercard) Pasadena, CA | 1,628.03 |
| Bank of St. Ann (Visa) St. Ann, MO | 3,865.89 |
| Bank of St. Ann (Mastercard) St. Ann, MO | 3,269.36 |
| CitiBank (Mastercard) Sioux Falls, SD | 1,117.31 |
| Diner's Club, Denver, CO | 3,300.00 |
| TOTAL | $23,718.54 |

The schedules also include credit cards with department stores, gasoline companies, and car rentals.

## CONCLUSIONS OF LAW

### a. *Jurisdiction*

This Court has jurisdiction over the parties and subject matter of these proceedings pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. These are "core proceedings" pursuant to 28 U.S.C. § 157(b)(2)(I), which the Court may hear and determine.

### b. *Dischargeability*

The creditors assert that Debtor's charges, to the extent they exceed the respective credit limits, are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). That section provides that a debt procured by false pretenses, false representation, or actual fraud, other than a statement representing the debtor's or insider's financial condition is not dischargeable. While courts have not been uniform in construing this section in credit card cases, *see, In re Carpenter*, 53 B.R. 724, 13 C.B.C.2d 1158 (Bkrtcy. N.D.Ga.1985) (division of authorities reviewed), this Court is bound by the decision of Judge Filippine rendered in *In re Schmidt*, 36 B.R. 459 (E.D.Mo. 1983). There Judge Filippine stated that

"in order to find a debt nondischargeable the Court must find that (1) the debtor knowingly made a false representation; (2) that it was made with intent to defraud; (3) that the creditor relied upon the false information. The purchase of goods with a credit card is an implied representation that the buyer has the means and intention to pay for his purchases, however, an intent to deceive must be shown. A showing of insolvency alone is not sufficient to infer the debtor's intent.

In addition, the type of frauds involved in 11 U.S.C. § 523(a)(2)(A) 'are those which in fact involve moral turpitude or intentional wrong and it must affirmatively appear that such representations were knowingly and fraudulently made.' 'Intention, of course, is a very subjective thing and in most instances can only be shown circumstantially' ...

Some courts have considered the following factors in determining intent:

1. Length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges are made;

3. The number of charges made;

4. The amount of charges;

5. The financial condition of the debtor at the time the charges are made; and

6. Whether the charges were above the credit limit of the account."

36 B.R. at 460 (citations omitted).

In determining whether this Debtor knowingly made false representations with the intent to defraud her creditors, all factors but the second are probative of fraudulent intent. All charges were made within one year of bankruptcy, at a time when Debtor was already highly insolvent. Debtor used the Chase card over 500 times and the First Community card more than 150 times. Moreover, these charges were made after Debtor's credit limit had been exceeded, and in the case of Chase, after Debtor had been specifically directed not to use the card. In addition, nearly all the charges were under $50.00, the cutoff point for detecting unauthorized use. In the circumstances, the Court finds and concludes that whenever Debtor used her credit cards after her credit limit had been exceeded, she knowingly made a false representation that she had the means and intention to pay for her purchases and that she made each false representation with the intent to defraud her creditors. Obviously, the Debtor did not have the ability to repay these debts. Her monthly gross income was approximately $1,500.00 at a time when she was charging an average of approximately $2,700.00 to Chase and $700.00 to First Community. The Debtor's summary of debts as of June 21, 1985, the day she filed her voluntary petition in bankruptcy, was around $65,000.00 with assets of $145.00. Ms. Cullen was hopelessly in debt

and literally living off of her credit cards. Her conduct not only revealed an unwillingness to pay Chase but an inability, due to a lack of funds, to repay her debts. Under the facts of this case, there can be only one conclusion. With each purchase she knowingly made a false representation that she had the means and intention to repay and that she made each false representation with the intent to defraud Chase Manhattan Bank, N.A. and First Community Credit Union.

Finally, the Court concludes that the creditors relied upon the Debtor's false representations. "Since the misrepresentation here concerns the Debtor's tender of the card as payment, the issue of reliance by the issuers of the card who have direct knowledge of the misrepresentation, would seem to present a conceptual difficulty. But the issuer, having paid the charges incurred by the card holder has become subrogated to the debt and is entitled to claim the reliance of the provider of goods and services. Furthermore, the credit card system functions upon the user's guarantee of payment for charges on its cards. The Debtor, in presenting the card and thereby forcing the issuer to honor its guarantee to merchants necessarily compelled reliance by the issuer." *In re Senty*, 42 B.R. 456, 460 (Bkrtcy. S.D.N.Y.1984).

CONCLUSION

All elements of the creditors' nondischargeability case having been proved, only the question of the appropriate relief remains. At trial the creditors amended their respective prayers, advising the Court that they were not seeking interest, or attorney's fees, but only the principal balance owed by the Debtor on the respective accounts in excess of the established and authorized credit lines. Within the past year the Eighth Circuit has held that attorneys' fees and interest are recoverable in a dischargeability complaint where the primary debt is held to be nondischargeable and the attorneys' fees and interest are considered to be ancillary obligations which attach to the primary debt in question. *In re Hunter*, 771 F.2d 1126 (8th Cir.1985).

Since, however, the creditors offered no proof of attorneys' fees and choose not to seek interest, separate orders will be issued this date entering judgment in favor of Chase and against Debtor in the sum of $14,430.07 and in favor of First Community and against Debtor in the sum of $5,033.80.