In re Laura **BLACKBURN**, Debtor.

**MONTGOMERY WARD AND COMPANY, INC.,** Plaintiff,

v.

Laura **BLACKBURN**, Defendant.

Bankruptcy No. 85–61354.
Adv. No. 85–6130.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Jan. 12, 1987.

D. Hallett, Borns & Quinn, P.C., Merrillville, Ind., for plaintiff-creditor, Montgomery Ward and Co., Inc.

C. Hawkins, Gary, Ind., for defendant-debtor.

### Opinion & Order on Objection to the Discharge of a Debt

FRANCIS G. CONRAD, Bankruptcy Judge.

This adversary proceeding concerns the plaintiff-creditor's objection under 11 U.S.C. § 523(a)(2)(A) to discharging a debt for furniture the debtor purchased on a credit card within forty days of her bankruptcy petition. We hold that, for goods or services purchased on a credit card to be excepted from discharge for fraud under § 523(a)(2)(A) when the debtor did not obtain the credit card fraudulently or use the card after being notified of its revocation, the objecting creditor must establish with clear and convincing evidence that the debtor charged the goods or services with no present intention of paying for them. Because the plaintiff has failed to show that the debtor did not intend to pay for the furniture when she charged it to her credit card, this debt should not be excepted from discharge.

The adversaries in this proceeding are the creditor, Montgomery Ward and Company ("Montgomery Ward"), and the debtor, who filed a petition in bankruptcy under Chapter 7 on September 13, 1985. Seventeen days earlier, on August 28, 1985, the debtor bought a sofa and love seat from the creditor for $1228.48, charging the purchase to her Montgomery Ward credit card. The creditor asks the Court to except this debt from discharge under 11 U.S.C. §§ 727(b) and 523(a)(2)(A), which provide that a debt for property obtained by false pretenses, a false representation, or actual fraud will not be discharged in Chapter 7.

The parties filed a stipulation of facts on September 25, 1986, acknowledging debtor's revolving charge card agreement, debtor's purchase of a sofa and love seat from plaintiff on August 28, 1985 for $1228.48 on this charge card, the unpaid balance on the account, and debtor's credit limit of $2,998.00. We heard this proceeding on December 9, 1986. At the hearing, the creditor called Ms. Marilyn Byker, a credit account manager with Montgomery Ward, and the debtor herself to testify. The debtor's attorney also took the stand to explain when he was first consulted by his client and when he prepared the petition. We accepted three exhibits into evidence: the charge slip and cash register receipt for debtor's purchase on August 28, 1985; her credit application and retail installment credit agreement; and, over the debtor's objection on grounds of relevance, a coded computer printout representing a credit history for debtor's charge card for the five

and one-half months before the purchase at issue here.

The stipulated facts, the testimony of the witnesses at the hearing, and the documentary evidence reveal that the debtor has had a Montgomery Ward charge card at least since August 1984. Before filing bankruptcy, she regularly paid the monthly balance due, with the exception of June 1985, when she made no payment, instead doubling her payment the following month. Her highest balance on the card before the purchase of the furniture on August 28th had been about $2215.00. At the time of the purchase, her balance was about $1700.00, increasing to about $2900.00 afterwards. Because of her good credit history, the debtor enjoyed a credit limit of $2998.00 on this charge card, a limit she never exceeded.

On August 28, 1985 the debtor purchased from plaintiff a sofa and love seat for $1228.00, charging the purchase to her Montgomery Ward credit card. Both pieces were on sale: the sofa, originally listed at $999.99, for $599.99; the love seat, listed at $899.99, for $549.99. She bought this furniture to replace a couch in her living room that was eight years old, used by children, and no longer serviceable because the cushions sank to the floor. These two items of furniture were defendant's only purchases on the credit card in August 1985.

The defendant, Mrs. Blackburn, is a widow whose daughter, Belinda, lives with her. Before the filing of the bankruptcy, a granddaughter by another daughter, Loretta, also lived with them. For the past eight years Mrs. Blackburn has been employed by the Lake County Prosecutor's Office as a secretary and clerk earning about $550.00 net a month. She also receives a pension of $282.26 a month from her late husband's employer. In addition, Mrs. Blackburn's daughter, Loretta, who is in the armed services, sent her $200.00 a month through the month of August 1985 for the support of Loretta's daughter, who was cared for by Mrs. Blackburn. Loretta's contribution was relatively constant, though occasionally Mrs. Blackburn returned some of the money to her. Although Loretta and her

daughter moved to Germany in July, she contributed $200.00 to the household in August.

Belinda also provided about $200.00 a month through May 1985 toward the household expenses, purchased her own gas, and paid the Montgomery Ward charge with the balance. This income stopped when Belinda was laid off from her job in the cafeteria at Indiana University in May 1985 with "total recall," that is, with the full expectation of being rehired in September. Unfortunately, in early September, Belinda and her mother learned she would not be recalled to work after all. Mrs. Blackburn first consulted an attorney by telephone about bankruptcy on September 12, 1985. The next day the attorney prepared and filed her petition under Chapter 7.

On December 10, 1985, plaintiff filed a form complaint alleging that, by purchasing the merchandise "and obtaining cash advances," debtor "impliedly represented" that she had the means and intention of paying when in fact she "knew or should have known that she would be unable to pay," had no intention of paying, and intended to defraud plaintiff through false representations and false pretenses. Plaintiff did not allege that the pieces defendant purchased were luxury goods under 11 U.S.C. § 523(a)(2)(C).

At the beginning of the hearing, the Court inquired whether, despite the failure to raise the issue in its pleadings, plaintiff would try to avail itself of the presumption of nondischargeability for luxury goods in § 523(a)(2)(C). Plaintiff argued that this subsection expressly refers to § 523(a)(2)(A), which it had clearly raised in the complaint. Defendant objected, pointing out that the defendant had earlier rejected a proposed stipulation that included a concession that the purchased items were luxury goods. We allowed plaintiff to present evidence under § 523(a)(2)(C), but reserved decision on whether to admit the evidence.

In accordance with Rule 7015 of the Bankruptcy Rules and Rule 15(b) of the Federal Rules of Civil Procedure:

> ... If evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits....

The rule provides that permission to amend be granted freely unless the objecting party demonstrates actual prejudice. We find that plaintiff's claim at trial that defendant's purchases were luxury goods was not made in bad faith. Moreover, on the facts and on the law, defendant had adequate notice that the issue might come up. The claim that the sofa and love seat are luxury goods arises out of the same transaction or occurrence as the claim that the defendant charged these items with fraudulent intent. And the claim is under the selfsame statutory section; for, as counsel points out, subsection (a)(2)(C) specifically refers to subsection (a)(2)(A). Compare *In re Tester*, 56 B.R. 208, 210 (W.D.Va.1985) (defendants not prejudiced by plaintiff's addition of a new legal theory based on the same set of facts); *In re Dunn*, 49 B.R. 547, 550 (Bkrtcy.W.D.N.Y.1985) (amendment stating alternative theories under the statutory section originally pleaded will not unduly prejudice debtor). Nor did defendant suggest that she was surprised or prejudiced by the claim. Indeed, defendant must have realized that plaintiff might raise the issue since plaintiff had included it as one of the terms in a proposed stipulation that defendant rejected. See, generally, *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), and the cases cited in Annot., What Constitutes "Prejudice" to Party Who Objects to Evidence Outside Issues Made by Pleadings so as to Preclude Amendment of Pleadings Under Rule 15(b) of Federal Rules of Civil Procedure, 20 A.L.R.Fed. 448 (Supp.1986). In the absence of bad faith by the plaintiff or prejudice to the defendant, we admit plaintiff's evidence supporting the presumption of nondischargeability under § 523(a)(2)(C).

Accordingly, we need to decide first whether defendant's purchase of the furniture satisfies the six pertinent elements of § 523(a)(2)(C), which refers back to § 523(a)(2)(A). To be presumed nondischargeable under § 523(a)(2)(A), the expenditures must be for:

(1) consumer debts, defined in 11 U.S.C. § 101(7) as "debt incurred by an individual primarily for a personal, family, or household purpose." See *In re Davis*, 56 B.R. 120, 121, 14 C.B.C.2d 732, 735 (Bkrtcy.D.Mont.1985); *Matter of Smith*, 54 B.R. 299, 301, 13 B.C.D. 900, 901, 13 C.B.C.2d 1083, 1084 (Bkrtcy.D.Iowa 1985);

(2) owed to a single creditor;

(3) aggregating more than $500.00;

(4) for luxury goods or services;

(5) incurred by an individual debtor;

(6) on or within forty days before the order for relief.

Mrs. Blackburn, an individual debtor, purchased for household use from Montgomery Ward for $1228.48 a sofa and love seat on August 28, 1985, within seventeen days of September 13, 1985, when she obtained an order for relief under Chapter 7 of the Bankruptcy Code. The debtor's transaction satisfies all but the fourth element. The remaining question, then, is whether the sofa and love seat are "luxury goods."

The Code does not define the phrase "luxury goods or services," except to exclude from the definition "goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." 11 U.S.C. § 523(a)(2)(C). The Senate Report attached to the Consumer Credit Amendments to the Bankruptcy Amendments and Federal Judgeship Act of 1984, which added subsection (C) to § 523(a)(2), merely reiterates that, "[a]s the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtor's dependents are not covered by the presumption." Senate Report No. 98–65, 98th Congress, 1st

Session 58 (1985), reprinted in 4 Norton Bankr.L. & Prac.Legis.Hist. § 523 (cum. supp. 1986). Since in this context luxury and necessity are antonymous, the exclusion of necessary expenses serves only to identify the opposite extreme from luxury, rather than identifying a point on a scale after which goods can no longer be considered luxuries and so do not create the presumption of nondischargeability. As we read this statutory language, the two categories are not mutually exclusive. Certain goods may not qualify as necessities and still not be luxuries.

Luxury in itself implies extravagance, superfluousness, self-indulgence; going beyond or overflowing an implicit, indeterminate level of comfort. It is the debtor's immoderation on the eve of bankruptcy that creates the statutory presumption. Because what amounts to excessive comfort necessarily depends on the debtor's particular situation, luxury is inherently relative. Compare *The Mary F. Chisholm*, 133 Fed. 598, 600 (D.Me.1904) ("The term 'luxuries' is an entirely relative term."). As used in § 523(a)(2)(C), "luxury" depends on the particular circumstances surrounding the challenged purchase and on the debtor's particular economic position. Compare *In re Davis*, 56 B.R. 120, 121–122, 14 C.B.C.2d 732, 735 (Bkrtcy.D.Mont.1985); *In re Stevenson*, 9 B.R. 437, 438 (Bkrtcy.D. D.C.1981).

One Court has made the sound suggestion we consider the price and the function of the purchased items, and whether items of this class are identified as exempt from property of the estate. See *In re Davis*, 56 B.R. 120, 122, 14 C.B.C.2d 732, 735–736 (Bkrtcy.D.Mont.1985). The price and the function of the goods raise several subsidiary questions: whether the purchase was new or used, whether it was a "de luxe" or basic model, whether it replaced an existing item that had outlived its usefulness or was a new acquisition, whether it was used in the ordinary activities of daily living, whether it was a gift, whether the debtor bought one or several such items, whether the store where the purchase was made could be considered "exclusive," and so forth. Several bankruptcy decisions address whether particular purchases are "luxury" goods. See, *e.g.*, *In re Faulk (Sears Roebuck and Company v. Faulk )*, 69 B.R. 743, 757 (Bkrtcy.N.D.Ind.1986) (Lindquist, C.J.) (clothes, shoes, boots, etc., were not luxuries; gift sets, cologne, fashion accessories, auto blanket, and coffee maker could be categorized as luxury items); *In re Hussey*, 59 B.R. 573, 575 (Bkrtcy.M.D.Ala.1986) (three-wheel recreational vehicle is a luxury); *In re Davis*, 56 B.R. 120, 121–122, 14 C.B.C.2d 732, 734–736 (Bkrtcy.D.Mont.1985) (a used 1984 Plymouth Voyager Van for the use of debtors and their family, for which they traded their previous vehicle, not a luxury item); *In re Ashton*, 51 B.R. 712, 713 (Bkrtcy.W.D.Pa. 1985) (Commodore Perry computer and auto parts were luxury goods); *In re Smith*, 50 B.R. 573, 575 (Bkrtcy.M.D.N.C.1985) (merchandise consisting primarily of clothing not luxury goods); *In re Bono*, 41 B.R. 629, 633–634 (Bkrtcy.D.Mass.1984) (bankrupt's purchases at exclusive establishments, including gifts for his non-bankruptcy attorney and an $1800 watch for his wife, "can hardly be classified as necessities"); *In re Lipsey*, 41 B.R. 255, 258 (Bkrtcy.E.D.Pa. 1984) (charges for airline, hotel, restaurant and bar services; a subscription to a sports publication; clothing; and sporting goods were, for the most part, for luxury items); *In re Johnson*, 40 B.R. 756, 757 (Bkrtcy.D. Minn.1984) (three oriental-style throw rugs for $2183.60 were luxury items); *In re Waldman*, 33 B.R. 328, 329, 11 B.C.D. 81, 82 (Bkrtcy.S.D.N.Y.1983) (charges of $65,110.68 for several hundred items purchased during debtors' trip to Europe characterized as a "buying spree"); *In re Ciavarelli*, 16 B.R. 369, 371 (Bkrtcy.E.D. Pa.1982) (candy and camera equipment are luxury items and not necessities); *In re Stevenson*, 9 B.R. 437, 438 (Bkrtcy.D.D.C.1981) (purchases, including a set of china for $158.08, were essentially necessities in connection with plaintiff's station in life).

■ At issue in this proceeding are a sofa and love seat the debtor bought for her home to replace a couch that was eight

years old and no longer usable. What is more, she bought the sofa, which had cost $999.99, for $599.99; and the love seat, which had cost $899.99, for $549.99. The debtor saved $750.00 by taking advantage of plaintiff's sale price and replacing her couch with these particular pieces. There is no evidence that Montgomery Ward is a particularly expensive or exclusive establishment or that this sofa and love seat were in any way remarkable. Although the furniture was new, the debtor apparently paid a bargain price. The pieces debtor purchased from defendant served the utilitarian and commonplace function of furnishing her living room. She purchased them not as gifts or extravagances but for the everyday household use of her family and herself.[1] Whatever the precise scope of "luxury goods" in § 523(a)(2)(C), the phrase was not intended to subsume the replacement at a reasonable price of ordinary pieces of household furniture. Under the circumstances, we hold that the two pieces debtor bought on her Montgomery Ward charge card in August 1985 are not luxury goods and that no presumption attaches to their purchase.

The statutory provision plaintiff is relying on to except this debt from discharge, 11 U.S.C. § 523(a)(2)(A), provides that:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

To realize the Bankruptcy Code's underlying policy of giving the debtor a fresh start, exceptions to the discharge of debts must be strictly construed in favor of the debtor and against the creditor's objections. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986); *Matter of*

*Cross*, 666 F.2d 873 (5th Cir.1982); *In re Vickers*, 577 F.2d 683 (10th Cir.1978); *In re Rahm*, 641 F.2d 755 (9th Cir.), cert. denied, 454 U.S. 860, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981); *In re Linn*, 38 B.R. 762, 10 C.B. C.2d 1049 (9th Cir.B.A.P.1984); *Matter of Schnitz*, 52 B.R. 951 (D.C.Mo.1985); *In re Marino*, 29 B.R. 797 (N.D.Ind.1983); *In re Tackett*, 66 B.R. 77 (Bkrtcy.N.D.Ind.1986). The objecting party must bear the burden of proving the exception to discharge. *Matter of Long*, 794 F.2d 928 (4th Cir. 1986); *In re Black*, 787 F.2d 503 (10th Cir.1986); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986); *Danns v. Household Finance Corporation*, 558 F.2d 114 (2d Cir. 1977); *Matter of Schnitz*, 52 B.R. 951 (D.C. Mo.1985); *In re Wright*, 66 B.R. 403 (Bkrtcy.S.D.Ind.1986); *In re Tackett*, 66 B.R. 77 (Bkrtcy.N.D.Ind.1986). The plaintiff asking that a debt be excepted from discharge for fraud must prove each element by clear and convincing evidence. *Local Loan Company v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *In re Kimzey*, 761 F.2d 421 (7th Cir.1985); *In re McIntyre*, 64 B.R. 27 (D.N.H.1986); *In re Wright*, 66 B.R. 403 (Bkrtcy.S.D.Ind. 1986).

To sustain a claim under 11 U.S.C. § 523(a)(2)(A) in this jurisdiction, the plaintiff must prove three elements by clear and convincing evidence:

> First, the creditor must prove that the debtor obtained the money through representations which the debtor knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. *Carini v. Matera*, 592 F.2d 378, 380 (7th Cir.1979). The creditor also must prove that the debtor possessed scienter, *i.e.*, an intent to deceive. *Gabellini v. Rega*, 724 F.2d 579, 581 (7th Cir.1984). Finally, the creditor must show that it actually relied on the false representation, and that its reliance was reasonable. *Carini*, 592 F.2d at 381.

---

1. Although 11 U.S.C. § 522(d)(3) exempts household furnishings or household goods up to $4000.00 in aggregate value from property of the estate, Indiana, which has opted out of the federal exemptions, does not specifically exempt household furnishings or goods. Indiana Code § 34–2–28–1.

*In re Kimzey,* 761 F.2d 421, 423 (7th Cir. 1985); *In re Faulk (Sears Roebuck and Company v. Falk),* 69 B.R. 743, 749 (Bkrtcy.N.D.Ind.1986) (Lindquist, C.J.). Compare *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986) ("a creditor must prove that: the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation"); *Massachusetts v. Hale,* 618 F.2d 143, 147 (1st Cir.1980) (under former statute, it must affirmatively appear the representations were knowingly and fraudulently made and were relied on by other party; in addition, fraudulent intent to deceive is generally required); *In re Mullin,* 51 B.R. 377, 378 (Bkrtcy.S.D.Ind.1985) (the false representation or false pretense must involve moral turpitude or intentional wrong, must be knowingly and fraudulently made, and must be relied upon by the other party).

Statements in the Congressional Record by Representative Edwards and Senator DeConcini indicate that § 523(a)(2)(A) "is intended to codify current case law, e.g., *Neal v. Clark,* 95 U.S. [5 Otto] 704 [24 L.Ed. 586] (1887), which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." 124 Congressional Record H11095 (daily ed. Sept. 28, 1978); S17412 (daily ed. Oct. 6, 1978), reprinted in 4 Norton Bankr.L. & Prac.Legis. Hist. § 523 (1983). In order to preclude the discharge of a debt for false pretenses, a false representation, or actual fraud, the debtor must be guilty of positive fraud or fraud in fact, involving moral turpitude or intentional wrong, not implied fraud, or fraud in law, which may exist without any imputation of bad faith or immorality. *Gabellini v. Rega,* 724 F.2d 579, 581 (7th Cir.1984); *Carini v. Matera,* 592 F.2d 378, 380 (7th Cir.1979); *In re Black,* 787 F.2d 503, 505 (10th Cir.1986); *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986); *In re Taylor,* 514 F.2d 1370, 1373 (9th Cir.1975); *In re Preston,* 47 B.R. 354, 357 (E.D.Va.1983); *Sanitation Recycling, Inc. v. Jay Peak Lodging Association,* 428 F.Supp. 1022, 1024 (D.Vt.1977); *In re Mullin,* 51 B.R. 377, 378 (Bkrtcy.S.D.Ind.1985); *In re Shebel,* 54 B.R. 199, 204 (Bkrtcy.D.Vt.1985).

Actual fraud "consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *In re Davis,* 11 B.R. 156, 158, 4 C.B.C.2d 377, 380 (Bkrtcy.D.Vt. 1980); *In re Burgstaler,* 58 B.R. 508, 515 (Bkrtc.D.Minn.1986). The insistence that an objecting creditor establish that the debtor acted with the intent of cheating the creditor before excepting the debt from discharge is consistent with the fundamental congressional policy of granting the honest debtor a fresh start. As the Court of Appeals for the Eighth Circuit explained:

> These considerations, however, are applicable only to honest debtors. Different considerations apply once a creditor has carried the burden of showing that a debt falls within the fraud exception to discharge and, therefore, has demonstrated the debtor's dishonesty as to that debt. When dishonesty is demonstrated with respect to a specific debt, the debtor "is no longer entitled to the benefit of debtor rehabilitation policy considerations."

*In re Hunter,* 771 F.2d 1126, 1130 (8th Cir.1985), quoting *In re Wilson,* 12 B.R. 363, 370, 7 B.C.D. 1061 (Bkrtcy.M.D.Tenn. 1981). Therefore, the failure to fulfill a promise to pay for goods ordered on credit cannot in itself support a finding of actual fraud. Compare *In re Salett,* 53 B.R. 925, 928 (Bkrtcy.D.Mass.1985); *In re Emery,* 52 B.R. 68, 70 (Bkrtcy.E.D.Pa.1985). Before denying the discharge of a debt, there must be proof of actual intent at the time of the transaction. *In re McIntyre,* 64 B.R. 27, 29 (D.N.H.1986).

■ Montgomery Ward alleges that defendant's having charged the sofa and love seat shortly before filing a petition in bankruptcy constitutes false pretenses and false

representations because the debtor impliedly represented that "she had the means and intention to pay for the purchases."[2] To the extent this allegation of fraud under § 523(a)(2)(A) hinges on an implicit representation by the debtor that she had the ability to pay for the charged purchase when in fact she did not, it is plainly precluded by the statutory language. Section 523(a)(2)(A) explicitly excludes "a statement respecting the debtor's ... financial condition" as grounds for finding false pretenses, a false representation, or actual fraud. Indeed, for the debt to be excepted from discharge, subsection (B) of § 523(a)(2) specifically requires that a debtor's materially false statements about the debtor's financial condition involve the "use of a statement in writing ..." If the misrepresentation on which an allegation of fraud turns concerns the debtor's financial condition, the misrepresentation must have been in writing. See *Engler v. Van Steinburg*, 744 F.2d 1060, 1061 (4th Cir.1984); *Blackwell v. Dabney*, 702 F.2d 490, 491 (4th Cir.1983); *In re Schwartz*, 45 B.R. 354, 356–57 (D.C.N.Y.1985). Since the plaintiff has presented no evidence that this debtor explicitly or implicitly misrepresented in writing her ability to pay for the furniture she charged,[3] we find that she did not incur this debt through a false representation or false pretenses.

What is more, in view of the requirement that the creditor establish actual fraud, involving moral turpitude or intentional wrong, *Gabellini v. Rega*, 724 F.2d 579, 581 (7th Cir.1984), and including the element of *scienter* or an intent to deceive, *In re Kimzey*, 761 F.2d 421, 423 (7th Cir. 1985), this Court will not follow the lengthy line of cases holding that by using a credit card the user impliedly represents he has the ability and intention to pay for the charge. See *In re Faulk (Sears Roebuck*

*and Company v. Faulk)*, 69 B.R. 743, 755 (Bkrtcy.N.D.Ind.1986) (Lindquist, C.J.); *In re Carpenter*, 53 B.R. 724, 727, 13 C.B.C.2d 1158, 1161 (Bkrtcy.N.D.Ga.1985) (citing the cases). As the Court pointedly observed in *In re Holston*, 47 B.R. 103, 108 (Bkrtcy. M.D.La.1985):

> [M]any of the credit card cases have found that when a person presents a credit card, he makes an "implied" or a "constructive" representation that he has the means to pay the bill and that he intends to do so. But, to imply a representation that one knows to be false and then to base a decision on that implied false representation is simply a longer journey to the same destination: implied fraud. It is a journey that violates the spirit, if not the letter, of ... the legislative history of § 523(a)(2)(A) ...

The implicit assumption that a debtor intended to defraud creditors because he was insolvent at the time he incurred the debt requires precisely the sort of leap of conjecture that the legislature meant to exclude by requiring the objecting creditor to prove actual fraud. The assumption obscures the essential distinction between "can" and "will," inability and unwillingness, objective circumstances and subjective intention. Consumers generally use credit cards because they lack the present ability to pay. *In re Carpenter*, 53 B.R. 724, 728, 13 C.B.C.2d 1158, 1162 (Bkrtcy.N. D.Ga.1985). A showing of insolvency alone is simply not sufficient to infer the debtor's intent. *In re Schmidt*, 36 B.R. 459, 460 (E.D.Mo.1983). As Judge Kahn remarks, "this is what is wrong with the 'implied representation' analysis; intent to defraud is too easily implied from the fact a debtor was having financial problems." *In re Carpenter*, 53 B.R. 724, 729, 13 C.B.C.2d 1158, 1164 (Bkrtcy.N.D.Ga.1985). It is, af-

---

**2.** Although difficult to distinguish at first blush, "false representation" has been construed to refer to an express misrepresentation, while "false pretenses" encompasses implied misrepresentations or conduct intended to create and foster a false impression. *Matter of Weinstein*, 31 B.R. 804, 809 (Bkrtcy.E.D.N.Y.1983); *In re Schnore*, 13 B.R. 249, 251 (Bkrtcy.W.D.Wis.1981).

**3.** Although in this case plaintiff has not made the argument, "[i]f it is the individual charge slips or receipts which Defendant-Debtor signed, the Court finds that these do not constitute statements of Defendant-Debtor's financial condition." *In re Carpenter*, 53 B.R. 724, 731, 13 C.B.C.2d 1158, 1166 (Bkrtcy.N.D.Ga.1985).

ter all, the financially troubled debtor who is likely to turn to bankruptcy for relief. Therefore, even apart from the statutory exclusion of unwritten statements about the debtor's financial condition, we hold that a debtor's "implied representation" of solvency cannot sustain an allegation of fraud under § 523(a)(2)(A). Compare *In re Hunter*, 780 F.2d 1577, 1580 (11th Cir.1986) ("absence of explicit representations concerning financial conditions by the bankrupt requires a holding that there have been no false pretenses or false representations").

Lastly, specifically with reference to false pretenses or false representation, a number of decisions have held that a charge card creditor who has not notified the debtor that his authority to use a legitimately acquired card has been revoked may not prevent the debt from being discharged on grounds of false pretenses or false representation. These courts arrive at this holding because the workings of the contemporary credit card industry require that the creditor assume some responsibility for protecting itself against a debtor's regression into unmanageable credit card debt. This reasoning goes rather to the third element of fraud the creditor must establish, namely, that the creditor's reliance on the "misrepresentation" was reasonable under the circumstances. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985); *Matter of Robinson*, 55 B.R. 839, 846 (Bkrtcy.S.D.Ind.1985).

In *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983), decided under the predecessor to 11 U.S.C. § 523(a)(2)(A),[4] the Court of Appeals for the Eleventh Circuit, relying in part on *Davison-Paxon Company v. Caldwell*, 115 F.2d 189 (5th Cir.1940), cert. denied, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), held that "[p]urchases made with knowl-

edge that one is not entitled to either use or possession [of a credit card] constitute the type of deception intended to be exempted from discharge" for false pretenses or false representations. *Roddenberry* at 932. The Court, concerned about the inequity of a creditor who acquiesced in the cardholder's accumulation of debt objecting to the discharge of that debt, explained:

> The element of risk is inherent in the issuance of bank credit cards. Our "credit-card economy" encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of the courts to determine when a bank ought to revoke credit. It is also of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such situations.... Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

*Roddenberry* at 932.[5] Compare *In re Carpenter*, 53 B.R. 724, 728, 13 C.B.C.2d 1158, 1162 (Bkrtcy.N.D.Ga.1985); *In re Shrader*,

---

**4.** Section 17a of the Bankruptcy Act of 1898, limited to false pretenses or false representations and applicable in *Roddenberry*, provided that: "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... (2) are liabilities for obtaining money or property by false pretenses or false representations...."

**5.** The Court in *In re Senty*, 42 B.R. 456, 461 (Bkrtcy.S.D.N.Y.1984), disagrees with this analysis if it "includes a debtor's transacting business in bad faith as a common business risk." In view of the requirement that the creditor prove actual fraud, we can not concur with this comment if "bad faith" includes a debtor's *inability* to pay, as well as his disinclination.

55 B.R. 608, 612 (Bkrtcy.W.D.Va.1985). Statistics released by a legislative committee in late 1985, cited in *Matter of Robinson,* 55 B.R. 839, 848 (Bkrtcy.S.D.Ind.1985), support the concerns expressed in *Roddenberry.* Seven hundred million (700,000,000) credit cards are in the hands of ninety-one million (91,000,000) Americans who are paying six billion dollars ($6,000,000,000.00) a year in interest. In the wake of this ocean of plastic, the consumer credit industry, by discontinuing improvident lending practices, remains in the best position to prevent debtors from going in over their heads. See *Matter of Robinson,* 55 B.R. 839, 848 (Bkrtcy.S.D.Ind.1985). In the absence of an intention to deceive, *Roddenberry* justly places the burden on institutions that issue credit cards to monitor their accounts. *In re Shrader,* 55 B.R. 608, 612 (Bkrtcy.W.D. Va.1985). The responsibility of the creditor is especially clear when, as in this case, the relationship between the creditor and the debtor:

> was "one on one" and occurred within a controlled environment in which the creditor knew what was purchased, when it was purchased and where it was purchased. This is very different from credit arrangement involving bank credit where a third party creditor has far less control over the use of its cards.

*Roddenberry* at 931. See generally Note, Creditor Acquiescence as a Defense to an Exception to Discharge in Bankruptcy, 58 Ind.L.J. 319 (1982); Zaretsky, Intent to Repay, 23 Wayne L.Rev. 1073 (1977).

In this case, the debtor did not obtain her card fraudulently nor had the card been revoked. Indeed, Montgomery Ward gave the debtor a credit limit of $2998.00, which she never exceeded. Under these circumstances, even had the debtor concealed her insolvency, as she did not, the plaintiff cannot prevail on its allegation of false pretenses or false representation.

■ *Roddenberry* was decided under § 17(a)(2) of the Bankruptcy Act, which is confined to false pretenses or false representations. We think that by adding "or actual fraud" to 11 U.S.C. § 523(a)(2)(A) as a ground for excepting a debt from dis-

charge, the legislature clarified the scope of the statute to encompass credit card debt incurred with no present intention of paying the debt. Compare *In re Holston,* 47 B.R. 103, 108 (Bkrtcy.M.D.La.1985). Therefore, we hold that "the 'revocation rule' of *Roddenberry* applies, except where a creditor can prove by clear and convincing evidence that the debt was incurred through actual fraud, *i.e.,* where the debtor made the charges with no intention of paying for them." *In re Carpenter,* 53 B.R. 724, 731, 13 C.B.C.2d 1158, 1167 (Bkrtcy.N. D.Ga.1985). See *In re Faulk (Sears Roebuck and Company v. Faulk),* 69 B.R. 743, 755 (Bkrtcy.N.D.Ind.1986) (Lindquist, C.J.). Under § 523(a)(2)(A), if the debtor did not obtain the credit card fraudulently or use the card after being notified of its revocation, the objecting creditor must establish the debtor's present intent not to pay for the goods purchased on credit. Compare *In re Schmidt,* 36 B.R. 459, 460 (E.D.Mo.1983). As one Court pointedly observed:

> Fraud cannot be based on statements or promises to perform in the future, absent proof of scienter ... No matter how unfounded the debtor's rose-colored optimism, the plaintiff must establish by clear and convincing evidence that the debtor had no intention of repaying [the debt] when he obtained the loans.

*In re Schwartz,* 45 B.R. 354, 357 (D.C.N.Y. 1985) (omitting a reference).

Intention, of course, involves a state of mind and must ordinarily be established from all the facts and circumstances surrounding the transaction. See *In re Cullen,* 63 B.R. 33, 35 (Bkrtcy.E.D.Mo.1986) (citing *In re Schmidt,* 36 B.R. 459, 460 [E.D.Mo.1983]); *In re Yagow,* 61 B.R. 109, 111 (Bkrtcy.D.N.D.1986); *In re Scoggins,* 52 B.R. 86, 89 (Bkrtcy.N.D.Ala.1985); *In re Gelfand,* 47 B.R. 876, 879, 12 C.B.C.2d 682, 686 (Bkrtcy.E.D.Pa.1985); *In re Holston,* 47 B.R. 103, 108 (Bkrtcy.M.D.La.1985); *In re Griffis,* 29 B.R. 110, 112 (Bkrtcy.D.Vt. 1983). Courts have suggested various factors to consider in determining whether a credit card transaction should be excepted from discharge under § 523(a)(2)(A).

Typically, the following factors are relevant to establishing a debtor's intention:

1. The length of time between the credit card charges and the filing of the petition in bankruptcy.

2. Whether the debtor consulted an attorney about bankruptcy before making the charges.

3. The number of charges made.

4. The amount of the charges.

5. Whether the debtor made several charges on the same day or at the same store below the amount at which the seller would seek approval of the charges.

6. Whether the charges represent an abrupt change in the debtor's use of the credit card.

7. Whether the charges exceeded the credit limit of the account.

8. The debtor's financial circumstances when the charges were made.

9. Whether the debtor was employed at the time.

10. Whether the debtor had reasonable prospects for employment or a reasonable expectation of additional income.

11. The debtor's financial sophistication.

12. Whether the items charged were superfluous.

See *In re Schmidt*, 36 B.R. 459, 460 (E.D. Mo.1983); *In re Faulk (Sears Roebuck and Company v. Faulk)*, 69 B.R. 743, 756–57 (Bkrtcy.N.D.Ind.1986) (Lindquist, C.J.); *Matter of Robinson*, 55 B.R. 839, 845 (Bkrtcy.S.D.Ind.1985); *In re Shrader*, 55 B.R. 608, 611 (Bkrtcy.W.D.Va.1985); *In re Carpenter*, 53 B.R. 724, 730, 13 C.B.C.2d 1158, 1165 (Bkrtcy.N.D.Ga.1985); *In re Holston*, 47 B.R. 103, 108 (Bkrtcy.M.D. La.1985); *In re Senty*, 42 B.R. 456, 460 (Bkrtcy.S.D.N.Y.1984); *In re Lipsey*, 41 B.R. 255, 258 (Bkrtcy.E.D.Pa.1984); *In re Kramer*, 38 B.R. 80, 83 (Bkrtcy.W.D.La. 1984); *In re Griffis*, 29 B.R. 110, 112 (Bkrtcy.D.Vt.1983). None of these factors alone is decisive. See, e.g., *In re Schrader*, 55 B.R. 608, 611 (Bkrtcy.W.D.Va.1985) (exceeding credit limit is not *ipso facto* proof of intent to obtain money or property

by false pretenses, false representation, or fraud); *In re Carpenter*, 53 B.R. 724, 730, 13 C.B.C.2d 1158, 1165 (Bkrtcy.N.D.Ga. 1985) (debtor's multiple charges below $50.00, the amount at which charges are approved, at the same establishment on the same day, satisfactorily explained by the debtor); *In re Lipsey*, 41 B.R. 255, 258 (Bkrtcy.E.D.Pa.1984) (whether debtor consulted an attorney about bankruptcy before making charges does not resolve question of debtor's intent to deceive).

■ Applying these indicia of intention to Mrs. Blackburn's purchase of the sofa and love seat from plaintiff, we conclude without hesitation that at the time of the purchase the debtor had every intention of paying for the furniture. The sole circumstance that could support an allegation of fraud is the proximity of the purchase to the filing of the bankruptcy. Although the debtor bought the two pieces some seventeen days before declaring bankruptcy, she did not consult her attorney until more than two weeks after the purchase. She bought only these two items of furniture in that month, paying a greatly reduced price for them. There is no evidence that these charges represented an extraordinary use of her credit card, and they were well within her credit limit. In August, when she bought the furniture, the debtor was employed, was receiving her husband's pension, received $200.00 from her daughter Loretta, and fully expected to begin receiving $200.00 a month from her other daughter, Belinda, beginning in September, money that was specifically intended for the Montgomery Ward account. Compare *Matter of Labuda*, 37 B.R. 47, 48 (Bkrtcy. M.D.Fla.1984) (debtor, who expected to return to his previous position, did not regain employment). Finally, the two items of furniture at issue were needed to replace the outworn couch in debtor's home. After she bought the two pieces in August, Mrs. Blackburn unexpectedly lost both Loretta's and Belinda's income of about $400.00 a month. Had these contributions continued, we do not doubt she would have paid the debt. The failure to foresee this unfortu-

nate turn of events hardly represents an intent not to repay amounting to fraud.

Because we have found Mrs. Blackburn's debt to be dischargeable, we address the issue of statutory attorney's fees and costs under 11 U.S.C. § 523(d). This subsection provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the Court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the Court finds that the position of the creditor was not substantially justified, except that the Court shall not award such costs and fees if special circumstances would make the award unjust.

A minority of cases hold that a debtor need not plead a request for attorney's fees under § 523(d), *e.g., In re Smith (Thorp Credit, Inc. v. Smith)*, 13 B.C.D. 900, 54 B.R. 299, 13 C.B.C.2d 1083 (Bkrtcy.S.D. Iowa 1985); *In re Sidore*, 41 B.R. 206 (Bkrtcy.W.D.N.Y.1984). Compare *In re Smith (Belk Center, Inc. v. Smith)*, 50 B.R. 573 (Bkrtcy.M.D.N.C.1985) (applying a F.R.C.P. Rule 11 standard to a § 523(a)(2) complaint). Other Courts have held that the debtor must request the award of attorney's fees and costs in the answer to the complaint. See *In re Finnie*, 21 B.R. 368, 6 C.B.C.2d 1036 (Bkrtcy.D.Mass.1982). Compare *In re Panaia*, 61 B.R. 959 (Bkrtcy.D.Mass.1985) (directing that an evidentiary hearing be held when the debtor requested an award of attorney's fees and costs in a motion to dismiss).

■ There is no legislative history to accompany the amendment to § 523(d) as it was enacted in the Bankruptcy Amendments and Federal Judgeship Act of 1984 (P.L. 98–353). We learn from remarks of Senator Grassley in the Congressional Record of June 29, 1984, at page 8897, 130 Cong.Rec. S 8887–S 8900 (daily ed. June 29, 1984) that P.L. 98–353 contains all the substantive changes made in a bill passed the previous year, S 445, The Omnibus Bankruptcy Improvements Act of 1983. The legislative history of that bill indicates that "to obtain an award of attorney's fees, a prevailing debtor must request a fee award and allege that the creditor was not substantially justified in challenging the dischargeability of the debt." S.Rep. No. 98–65, 98th Cong., 1st Sess. 58, 59 (1983), Senate Report accompanying S 445, The Omnibus Bankruptcy Improvements Act of 1983.

It is clear from the Senate Report accompanying S 445, the predecessor to the 1984 Amendments, that Congress intended a debtor to request attorney's fees and costs if the debtor prevailed on a complaint to determine dischargeability under § 523(a)(2). Accordingly, we decline to follow *In re Smith (Thorp Credit, Inc. v. Smith)*, 13 B.C.D. 900, 54 B.R. 299, 13 C.B.C.2d 1083 (Bkrtcy.S.D.Iowa 1985). Absent from the legislative history, however, is direction on how and when the request for attorney's fees and costs must be made. We think the request should be made so as not to prejudice the creditor in defending against the allegation that the complaint was not substantially justified. In other words, the request should satisfy the requisites for a motion under Rule 15 of the Federal Rules of Civil Procedure.

We are concerned that Montgomery Ward may not have been substantially justified in bringing this proceeding against Mrs. Blackburn. Plaintiff's credit account manager testified that her employer would have filed the § 523(a)(2) complaint against this debtor even if it had known that the debtor's husband had died and that the assistance a daughter had been providing had stopped. Most tellingly, she explained that it was Montgomery Ward's policy to pursue bankrupts who made purchases within forty five days of filing a bankruptcy petition. We disapprove of corporate policies that blindly institute proceedings against debtors.

Nowhere in the debtor's pleadings or testimony, however, did she request attorney's fees and costs. Without such a request and an evidentiary hearing, we cannot decide whether the plaintiff's complaint was substantially justified. Accordingly,

882

We ORDER that Adversary Proceeding No. 85–6130 is hereby DISMISSED, and FURTHER ORDER that the Clerk of the Bankruptcy Court enter Judgment for the debtor, Mrs. Blackburn, and against the plaintiff, Montgomery Ward and Company.